Court is now back in session for students to adjourn the hearing, and I will allow the seat cuts to be decided. Please be seated. Your Honor, this case comes on a student's behalf. On page 145, the people of the state of Illinois, Illinois, New York, and Brown County, Mr. Bruce Perkin, on behalf of the plaintiff's attorney, Mr. Joshua Schneider. All right. Thank you, Mr. Perkin. On behalf of the appellant, you may proceed. May it please the Court and Counsel, good morning, Your Honors. This is a case that stretches the state's law of criminal liability based on a theory of accountability beyond its breaking point. So the issue presented in this appeal is for this Court to determine where are the limits of criminal liability under the state's common design theory of accountability. Illinois has long followed the common design rule of accountability, and it's codified in the criminal code in Section 5-2C. It states that when two or more persons engage in a common criminal design or agreement, any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement, and all are equally responsible for the consequences of those further acts. So based on this common design theory of accountability, Warren Brown was convicted, following a bench trial, of charges that centered around a scheme in which his co-defendants used stolen identifications to secure admissions to colleges, the College of DuPage, the University of Phoenix, and submitted to apply for college financial aid under those stolen identities, and in some cases succeed in obtaining some of those financial aid funds. The scheme was large. It involved student loans through the College of DuPage, the University of Phoenix, and the names of about three dozen people, and the financial aid that was granted in these cases was valued at more than $300,000. You agree, and I think you acknowledge in your brief, the evidence showed that the defendant acknowledged victimizing Mr. Steinbrink, correct? On at least two occasions, those two withdrawals? Yes. And he had one of his, two of his credit cards in his drawer. Yeah, and that was the... And his telephone, his telephone, or the telephone phone in his room was used 75 times, approximately 75 times in a four-month period to make telephone calls in connection with the scheme to the University of Phoenix and COD. The phone that he shared with co-defendant J.C. Brown. Right, that phone. And that's the same phone that was used to make the phone call that's in dispute, the foundation issue. Yes, that's correct. But J.C. Brown, the co-defendant, was also living in that house, and the evidence did not connect him to, did not connect Mr. Brown to that evidence beyond that telephone. Those are, that's a credibility in how much weight is given to it was up to the trial court, correct? It's circumstantial evidence, but given the evidence that does not connect Mr. Brown to these offenses is... Well, you can make a plausible argument, but let's take it a little bit further. Because I understand the argument, and if in fact the plethora of evidence beyond any reasonable doubt found at the house, you can say doesn't necessarily mean he had anything to do with this. It's certainly conceivable and possible. You could have a situation where some roommate was engaging in criminal activities. We'd have to concede he had nothing to do with the other roommate. However, how do you explain that he goes to the ATM machine with somebody else's card? He doesn't, he's not concerned about how she got it, okay? And he also says, yeah, besides that, I know that she's probably engaging in some kind of fraud. Didn't he make that admission? She's probably defrauding people. I wouldn't read too much into that statement. You're referring to the text message that was found on his computer. No, he talks to the detective. Didn't he tell a detective that he thought that Ms. Blue was probably engaging in some fraudulent conduct? Didn't he make that admission or did I miss that? She has, yeah, that's, he did make a statement to the police. Okay. And under questioning, he said it's conceivable she could be involved in fraud. That's my understanding. He says that she could be involved in fraud and he takes a card, a debit card from her, and it's in the name of somebody else and goes to an ATM with it. That's a little bit beyond documents being found in a house, isn't it? Okay, so he concedes and we concede that he did that, that he withdrew $840 from an ATM. It doesn't bear any accountability argument. It limits him to the David Steinberg case because, just simply because he withdrew $840 from an ATM card at the request of co-defendant Dacia Blue does not mean he was accountable for the entire $300,000 of loan. No, but it can be considered. It doesn't limit his legal exposure to the Steinberg case because, you know, you have these other things that provide circumstantial corroboration doing that. Very, very thin circumstantial corroboration. Doesn't his use of the Steinberg card also corroborate the telephone call that it was, yes, it was in fact him that called, which was part of the scheme to defraud COD? I don't think it corroborates it at all. What does the Eleanor Rule of Evidence say? The foundation can be established by other facts and circumstances, correct, besides the identity. He's using this person's identity. He's using this person's credit card. That corroborates the fact that he may also be responsible for the attempt to defraud COD. You don't believe that that connection can be made? Is that what you're saying? I'm saying that there's a foundation problem for that telephone call. What's the foundation problem? That they never identified the caller beyond an African-American male in his 20s. The person who took that call, Jim Yacek, of the cashier's office at College of DuPage, had no prior conversations with the defendant. There was no post-call conversations or opportunity to hear the defendant's voice. Was that telephone connected to any other African-American male besides the defendant? There's a co-defendant, Jesse Wright, who's an African-American male. My question is, was the phone connected to any other African-American male? It's not connected to the defendant, either. It was found in his home. In the home of Dacia Blue, who was central to this fraud scheme. It was a female. Yes. And there was testimony by Ms. Yacek. She also received numerous calls from females. So your argument is you can't look at the defendant's other behavior with respect to Mr. Steinbrink. You have to look in isolation only at the phone call. You have to establish the foundation for admission of that phone call. And that wasn't done. That's a pretty rough requisite to being able to consider that evidence. And he was asking, what bank account was he asking the money to be sent to? I don't recall. Would it just so happen to have been the same account that he was drawing funds from? Yes. It was Mr. Steinbrink. Yes. So the fact that he's calling to ask that money be sent, or that some person is calling to have money sent to an account, that he admits that he's withdrawing funds from illegally, that is not a connection that could lead to a foundation for the phone call. Phone calls, you can consider circumstantial evidence. Yes. That's certainly the black letter law in this case. However, where there's a co-defendant who meets the exact characteristics of the attempt to identify him, if they seem to lose what these other co-defendants, there's no evidence that the phone call was made from that home, only that the telephone was found in the house that he shares with the co-defendant. The State doesn't have to prove beyond reasonable doubt that the defendant made the phone call. The phone call evidentiary foundation is just the trial court's gatekeeper, just that it has to be reliable in order to be considered. It's not like an element of the offense. Would you agree? Yes. Okay. Well, further, why doesn't the argument go to the wage rather than the invisibility? I mean, I agree with you. The traditional foundation is the caller recognizes the voice, they've heard the voice before, they've talked to the person. That's the traditional foundation for a phone conversation. But if he tacitly admitted their knowledge, it can't be laid by circumstantial evidence. Right. Right. Well, and, you know, that's a tricky question in this sense, that if you admit it and say the circumstantial evidence shows it's him, then you've already found that he made that call. Even if it's not his call. If it's a co-defendant who's making the call as part of this conspiracy, it comes in anyway. Right? Well, we can see there's a large conspiracy. My argument to you today is that Mr. Brown was involved in such a narrow slice of that that he should not be held accountable for anything beyond David Steinberg. You know, each one of these incidents of identity theft and defrauding these universities is a separate and distinct incident. You know, if you say, okay, you took the $840 and gave it away from the ATM machine, if you take the next step and say circumstantial evidence shows he made that call and attempted to get more in the David Steinberg case, that's the limits of his legal culpability in this case. And it should be the limits of his culpability under the common design rule of accountability. You know, if Bernie Madoff's wife, if Bernie asks his wife to take a check down to the bank and cash it and make a payment on their summer home, she's not responsible for this entire however many millions of dollars of fraud he committed. There has to be some kind of limit of a person who gets involved in a very narrow slice of a broad conspiracy or scheme that takes place and unfolds over a large period of time. It just seems like an incredibly broad net to cast in these cases. Your backup argument that since the state only called five of the individuals that the charges should be reduced to the class one and class two as opposed to the accident one, is proof of lack of authorization an element of identity theft? I don't know. It's not, is it? No. So the state doesn't have to call the victims. But they have to prove the corpus electi of the offense here that they're responsible. Well, didn't they do that through the universities? Through the complicated web of... No, but they testified to the amount of money that they lost. Yeah, there was evidence presented that... Identities of other individuals were used to defraud them. At the same address as you, but through... You're not contesting that these people existed, are you? No. Well, I don't know whether they exist or not because the state presented no evidence of that. I don't know whether they exist or not. They could be fictional people, just as the five people who did testify are real people who had their identities stolen. But the fact remains that we have two institutions of higher education who are out a fair amount of money. They are the real victims here because they're the ones who have to pay the money back. Correct. So we have legitimate victims in place, and they acted upon these applications whether they were real people or whether they were not real people, correct? Correct. All right, good. In any event, an appeal, you look at the... Our obligation is different than the trial judge to determine if this is the truth beyond a reasonable doubt. It may be a narrow issue at Stanford. An appeal, we consider the telling of the evidence in the light most favorable to the prosecution, if you agree with that. That's the standard of review when you appeal in saying the defendant wasn't proven guilty beyond a reasonable doubt. That is the reasonable doubt. It's a little bit different standard. Well, but I think there's a purely legal issue involved here, too, and that's the scope of the common design rule. You know, it's interesting that you frame the issue that way in the sense that the major ruling in the trial court was on the motion for direct verdict in which the defendant argued that my improper use of the $840 with the ATM card doesn't make me accountable for everybody else, and the trial court said, well, the standard on a motion for direct verdict is the evidence in favor in the light most favorable to the state, and therefore, I deny your motion. And at closing argument, everybody deferred back to their arguments that were extensive at the close of the state's evidence. I don't know that the question of the scope, the proper scope of Illinois' accountability law ever got a thorough investigational ruling in the trial court, and that's why I bring it to your attention. Well, let me just touch on something that raised the question in my mind on the common scheme and design. So you're saying that in order for him to be convicted of these other transactions, under no circumstances can an individual be convicted unless you can tie them specifically to every other act of the co-defendant. Is that what you're saying? I'm saying that at a minimum, he has to have knowledge of the overall scheme. Well, how do you ever prove that except by circumstantial evidence? We know he was involved with Steinberg. He's acknowledged that. We have all these other people, the same evidence in the same house, so, I mean, you would be taking the argument as unless you can prove beyond a reasonable doubt every transaction he was involved in, you can't have a conviction under an accountability theory. I don't know if that jives with the law. It's an incredibly harsh application of Illinois law to say if you take $840 and you have no knowledge that there's this broad scheme going on that's lasted over a year and your co-defendants are defrauding universities of over $300,000 and you're living... If you've attached yourself to a group who are conspiring to commit acts, it's no different than a drug ring. You've got people delivering heroin in K-Town and you're set up in Elgin. You have to know what transactions are taking place or even know who the sellers are to be accountable. You don't have to, correct? You don't have to know to that specific extent, but you do have to have some kind of knowledge. Well, the defendant was pretty much, would you agree, he was pretty much living at the epicenter of this scheme? Yes. Okay. And I know my time is up, but if I can make an important point here. Of the four co-defendants, the defendant is the only one who did not apply or have an application for admission and loans in his name. Some would say that he was the smartest of the group. Well, but the point I'm trying to make is that Dacia Blue, who lived in the house with them and was admitted to College of DuPage, it makes perfect sense that he would know that and that any material in the house that has College of DuPage on it or any mail coming in in her name, that doesn't mean he knows that she's the epicenter, the brain of a multi-hundred-thousand-dollar fraud scheme. There was also material from University of Phoenix and information with other people that didn't live at that address coming to that home, correct? I know there was a lot of material on computers and there's so much. So, you know, is he accountable for everything on her computer? You know, that's a tricky question, too. Well, the computer also had his e-mail address on it. He logged in one time to check his e-mail on this computer. He didn't need the money. He had a good job, right? He was an electrician making $4,700 a month. Was that introduced in evidence? I believe that came up in sentencing. Right, so the trial judge didn't have that information before, correct? Well, financial need, I don't know how that's working. That he was working and that he didn't really need the money. Yeah, but there's really nothing to connect him to other than his presence at the scene of the crime. You described it as the epicenter of this. Did he ever ask, we're assuming that Blue sent him with this card, go do this, in this car that, it's a pretty nice car, did he ever say, wait a minute, your name's not on this, my name's not on this? He didn't ask any questions? Was it one of these, where we don't do any of those things and therefore we don't know? I think that's not far off. He did ask, he said, what's going on? She said, don't worry about it, do it, and he did it. Well, that's an even worse answer than this. No, I don't see it, I don't hear it, I don't... David Steinbring, yes, he admitted it. He used a card of David Steinbring's. He didn't know that, there's no evidence that shows he knew who it was, that the contents of that account that he made that withdrawal from was financial aid proceeds or anything. Well, then, okay. You know, that doesn't show his knowledge of this broader scheme for which he's been held accountable. Except he acknowledges that he knows Ms. Blue is engaging in fraudulent activity. Maybe it's just me, but that to me is a very key part of this entire case because that undercuts every argument you can make about being naive. A roommate could say, hey, go to the ATM and withdraw this card. Somebody, a young college student, could say, well, you know, what's this about? Don't worry about it. Okay. But when you couple the head with him saying, I think she's probably engaged in some kind of financial fraud, doesn't that add to the mix here? You know this is not just a simple naive transaction. I think you have to be more specific to tie the defendant into his knowledge of the scheme than the statement that she may be involved in fraud. You know, she has a history of fraud that he acknowledges. You know, when he sent that text message in August of 2011, Dasha is fraud, that is not specific. That's very vague. That doesn't, you know, fraud could mean anything. You know, she's, you know, squeezing off grocery money from what I give her. You know, I think you've got to be able to tie it in to show some connection to knowledge of the broader scheme rather than the isolated particular incident of the fraud involving David Steinberg. Anything else? No. Thank you. All right. Thank you very much. And you'll have an opportunity to address us again as well. Thank you. Mr. Snyder, on behalf of the people. Good morning. May it please the Court and counsel. The defendant doesn't seem to dispute the existence of the scheme. I don't think really the scope of the scheme that it was these three dozen individuals whose identities were used to fraudulently obtain financial aid, and he doesn't dispute that it was being operated out of his house. His argument seems to be that because he only withdrew funds from the David Steinberg account, he can only be held liable for that piece of the scheme. Was that the account that the money was, that he requested the money be sent to, or was it some other account? That was the account. So what happened was a fraudulent application was filed for David Steinberg. The College of DuPage, or rather the U.S. Bank, issued a debit card to grant access to those financial aid funds. That card was sent, I believe it was to 543 Peregrine Parkway, which was the same registration address as four other of the fraudulent student accounts, and was the townhouse connected to co-defendant Olympia Blue's home. And we had an unsecured mailbox so she could take mail out of it with no difficulty. When defendant emptied that account, there was then a call placed by an African American male about defendant's age from a phone recovered from his home. The same phone was actually used to try and get funds put into another fraudulent student account, the Beverly Williams account, by a woman's voice. And the attempt at disbursement was to replenish the bank account connected to that U.S. Bank debit card. And really the David Steinberg line of evidence shows you the entire scheme, sort of from soup to nuts. To every individual. That basically explains it. If you look at Steinberg, you've looked at the whole case because this is the scheme. Exactly. That shows you from the application to the disbursement of the funds to trying to find some way to enable reimbursement, replenishment without having to show up physically. Because one of the problems, of course, was that Steinberg was enrolled in all of these online classes and was never attending, so that sent up red flags. The school realized there's something fishy about this, so they put him on a list that he could no longer get funds distributed automatically to the account, and now to pick up a physical check. And that's what prompted the call, because they couldn't show up. They had no identification to prove that anyone was David Steinberg. They needed the funds to be mailed. So when the defendant called, he first tried to get them to disburse the funds to the account, and then he said, well, if you can't do that, can you just mail the check to 543 Bergen Parkway? And it's not simply that he was connected from beginning to end with the Steinberg fraud, because that address links Steinberg to a number of other accounts. Steinberg was at 543 Bergen Parkway with four other students. Mail from that address was recovered from the home. Before he was registered at 543 Bergen Parkway, Steinberg and another fraudulent student, Aprecia Wallace, were registered at 278 Luella Lane in Calumet City, which was the defendant's old home. What were his aunts? It was his aunt's house where he had lived. When Detective Musterman from the College of DuPage Police went by, he saw that it had a for rent sign. Also an unsecured mailbox with a card with Steinberg written on it taped to the lid. You know, I mean, I think you're right. Steinberg's transaction sets forth the pattern and the course of conduct, but opposing counsel would say, yeah, I recognize that, but how does that establish that he had anything to do with these other transactions or even knew about these other transactions? So how do you respond to that argument? Well, it's of course going to be circumstantial evidence. All of the accountability hinges on knowledge, and so if the defendant's not willing to get up and testify to his knowledge, then we're sort of stuck for direct evidence. But there's plenty of circumstantial evidence linking him to the rest of the scheme, which is, So first of all, there was the other student who was registered at the 278 Luella Lane address, which was his address that links him to that student. There was the real mountain of evidence that was recovered from his home. His home was awash with debit cards and mail addressed not only to other people but to other addresses. When you say they had other people, and in your brief you set forth the state's not required to prove unauthorized use. You are required to prove that those identities belong to another person, though, correct? That's true. They do have to be. And how is that proven with respect to the other individuals other than the five who actually testified? So in the testimony of Ms. Prisco from the College of DuPage, I believe, she indicated that when you apply, the information that you put in includes your Social Security number. So if it was not an actual Social Security number, it wouldn't have gone through the federal. So that's enough to circumstantially prove that there was an actual person? Certainly in the light most capable to the state, that would support that. It would be sufficient to support that evidence. And the defendant did not contest that at trial, correct? That's correct. The defendant's argument about the scope of the scheme not extending beyond the five people who actually testified was that there hadn't been evidence that there wasn't permission to use the other identities. But, of course, permission is not an element. So what ties in overlapping? I mean, again, I mean, he argues the point. Some may say, well, you know, in the real world it doesn't make any sense. You could have a roommate living under your roof who theoretically could be involved in all sorts of illegal and nefarious schemes, and you would not necessarily know it. It seems to be his argument. Sure. And that's true. I mean, the case law establishes that simply being in a building where someone else is committing a crime doesn't make you accountable for the crime. But we certainly have much more than that here. For one thing, we've got the phone call from the phone found in the defendant's home from an African-American male of approximately his age who was trying to get funds dispersed to the account that only he has access to. The Steinberg debit card was found in the dresser drawer. I believe it was a bedside dresser. That included two of the defendant's IDs and eight of his credit cards, which certainly supports the inference that that was his bedside dresser. Now, did he live there with Blue? Was there anyone else living in the house? I believe there was a child as well. There were only two adults. Right. It was Blue's child, correct? Yes. Okay. So the phone call is sufficient. I'll say in passing there was also sufficient evidence to lay a foundation, since all that's required is sufficient evidence to support the finding that the caller was defendant. And that, of course, can't be circumstantial. Here, again, is the Steinberg line of evidence, that he had the card, he emptied the account, there was a call placed from a phone in his home to replenish the account, and he retained the card, indicating he anticipated there would be further funds available. Other evidence linking him to the full scope of the scheme is the computer evidence. There was an awful lot of traffic on these various computers. Counsel referenced the Gateway laptop, where defendants' e-mail address had been accessed. And he said, well, that was only the one time. But there was also the Toshiba laptop, which accessed defendants' Facebook page 66 times, which was found homework assignments and financial aid documents and exams and correspondence in the names of the various fraudulent students as well. So there are three computers in this house, all of which were used extensively in furtherance of the scheme. Defendant's argument essentially boils down to, yes, there was all this mail in the house that wasn't to my address and wasn't to anyone who lived in the house. And, yes, there was all kinds of traffic on the computers. And anybody could use the computers, right? Anyone could use all this. And so maybe I didn't know about it. And a fact finder could have decided, you know, we don't think it was enough. But in the way it was favorable to the State, certainly it is sufficient to support the inference that he was aware, which is all we need at this stage. And even the Facebook account could have been hacked with information, but the information was still before the trier effect. Exactly. And the trier effect considered all the evidence presented and drew the inference that he was aware. And, again, all he needs is, I believe we cite people named Perez, evidence that he voluntarily attached himself to a group that was bent on illegal acts and he had knowledge of the design. And his text message from August 11th saying that Deja is doing fraud is an example. Isn't that an important piece of evidence? It's certainly helpful. It's one of the cleanest pieces. I mean, the circumstantial evidence is more than sufficient, but that is a nice encapsulation of his knowledge, is when he sends a text message in August of 2011 saying she is doing fraud. Not she was doing fraud. She is doing fraud. And that was, we know, during the lifespan of the scheme because Juwanda Harris had fraudulent applications sent in February of 2011. So it had already been underway. Exactly. What about the issue of the restitution schedule? You agree it has to go back for setting up the schedule? Yes, we do. And, again, he is responsible for the whole amount. If it goes back and the whole amount, why would he even be tasked with the whole amount? So the statute, 730 ILCS 5 slash 5 dash 5 dash 6C, says that each defendant is liable for the entire amount. And the reason is we want to put the criminals on the hook for the risk of nonpayment, not the victim. Of course, he's joined several, so should he pay the entire amount and then his co-defendants come in and pony up their share, he'll be entitled to a refund of those amounts. But we put the risk on the criminals, not the victims. Any questions? No. All right. Thank you very much. Thank you. Mr. Kirkham, you may address the Court and rebuttal. Thank you, Your Honor. This question is circumstantial evidence. There were 51 ATM withdrawals using financial aid debit cards totaling over $26,000. The only one that was attributed or the only one that was done by the defendant in this case was $840 in Steinbrink's name. He is not the central player in this case. He's very peripheral to this fraud scheme. But whether he is the middle, you know, the big guy or the peripheral guy, the issue is did he know or did he have reason to know that this was going on? And there is some evidence from his mouth that he thought she was doing fraudulent things. She is fraud was what the text message said. The love of his life is fraud. What does that mean? She's been engaged in fraud in the past? That doesn't indicate in August of 2011 that he's familiar with the scheme as it existed and unfolded in 2012. Well, you know, and I ask this question because when I was reading the briefs and looking at the record, Steinbrink is a good example of what the entire scheme is, and he's all over Steinbrink. He's all over it. It seems, I know your argument seems to be this is really unfair. He should only be held responsible for his little piece of the pie, not for the whole pie. That's your argument. Which is another way of phrasing what is the scope of the common design rule of accountability. It can be very all-encompassing. In some way argue harsh. It's very harsh, and this is a case study. Is it that you ask for the General Assembly? It's a matter for this court to set that. I mean, the statute exists, and this court can apply that statute. Well, accountability is, it is broad. You know, if you look at the reason, if you look at the treatises and all the cases of accountability and looking at this common design rule, these are all, those are all like violent incidents and episodes. Somebody don't agree with them. You know, I made the analogy to criminal conspiracy drug trafficking. Very broad for a reason. I mean, it's a good analogy. You're in a house with somebody. You would say that if one personal roommate does one drug transaction, okay, and the other roommate does 100 transactions, and they both know that they're engaging in drug activity within the house, that he would only, the person selling one should only do charges once and should not be accountable. But is that the law? Well, but you add an additional fact to my argument, which is they both knew of each other's transactions. He says he knows who was doing something fraudulent, right? But he doesn't specify what his history of fraud. It's early. It's in August of 2011. The same phone, the same phone that was recovered that was used to make the Steinbrink phone calls is used to make 75 other calls to COD and University of Phoenix. None of which were ever tied into the defendant. The phone is recovered, and he has used that phone. One time that we know of, at best, if you accept that he was one of the two co-defendants that actually made that phone call. Right, calling to ask for money to be sent to the account that he just emptied. Mr. Perkin, if we, even if we feel this is harsh, and I think all three of us have expressed some concern about that, what is our responsibility other than to follow the law? Create a new law? That's certainly within the power of this Court to interpret that statute. Well, we do have a responsibility to interpret the statute. But what if our interpretation is it is harsh? I mean, that's a plausible outcome of this case. We've all said it. We've all used the word at least once. Right. And we can say, legislature, this is really harsh. You need to look at it. And they can say, too bad, so sad. Or they can say, we're going to do it. But the issue today is, do I have an obligation to follow the law, harsh or not? Do you want to answer that question? He's got it. No, I think that you can say, you know, the statute is not intended, our reading of the statute does not extend criminal liability where two unrelated, separate incidents of a broader, larger, time-consuming scheme. And can you give me some authority on this issue to do that? You would be creating that authority. You know, that's where I would... I'd like to do that, but I would prefer if you could give me some... You'd like to have something to hang your head at. Yeah. See, that's where I was going when I talked about, if you read the treatises on accountability and limitations, it's all about natural and probable consequences. That's a phrase you see. Natural and probable consequences of entering into a common design to rob a 7-Eleven and the clerk gets shot at. And the fault doesn't die, so it's not felony murder. Those kinds of situations are covered by this common design. Okay. But let's just take that one phrase, natural and probable consequences. Our... Mr. Brown here has taken a card. He knows not to be his. He knows not to be Ms. Blue's. He's taken the money. If we allow the phone call, he has called to replenish that account. Natural and probable consequences of that particular act and all the other information that's sitting around in his house. This is getting bigger. Well, there was a series of facts that were brought out in this trial that undercut all that circumstantial evidence. The presence in his house of stuff that is in Daysha Blue's area of the house, in her name, her computer. I mean, the parties declared that Detective Mushroom would testify that none of the witnesses he spoke with during the course of an investigation ever mentioned the defendant's name in connection with these charges. And I'm summarizing what's in my brief at page 23, so this is all right in the page references. The defendant was the only one of the four co-defendants who didn't apply for loans in his own name, the College of DuPage, or the University of Phoenix. They found no text messages or written communications related to the charges between the defendant and the three co-defendants. There's no mail related to this fraudulent activity addressed to the defendant at his home in Mohegan. No scheme-related documents addressed to the defendant were recovered during the investigation. What about his aunt's house? Yeah. His Florida residence. I mean, if they were going to use his aunt's house, wouldn't it make sense that somebody would have said, would it be okay? You know, his close association with Daysha Blewett, and, you know, they've got a home together, there's a child. You know, anything that she does, you can almost tie to him just by virtue of his association with her. And guilt by association shouldn't be enough. You know, there's got to be something to tie this defendant to the broader scheme. Did the state present evidence as to where the money went after it was withdrawn from the various accounts? There's so much evidence in this case. The only evidence I recall that went to that was what happened with the defendant's account right after he did the ATM withdrawals. I don't know who got how much. And whether or not they were just spending the cash or investing it somewhere else. Correct. I don't recall, and I don't think there was any testimony to that. I know my time is up, but if I could just make one more point. The issue of restitution came up during the state's argument. I didn't get to it in my case. The statute only allows parties to recover actual out-of-pocket losses. If you send this back and the state concedes it's got to go back for, at the minimum, a consideration of restitution, the state should be required on remand to present some evidence of actual losses. The restitution amount here is simply the amount of aid that was sent from the U.S. Department of Education to these colleges. Just for a quick example, the call that was made to the College of DuPage cashier's office trying to get more David Steinbring money, the issue there was a written check. I think there's a strong implication there that that check didn't wind up in the hands of any of the co-defendants. That shouldn't be a loss that is charged on to. There's a whole series of those kinds of things. How much money that the colleges retained as restitution and fees and stuff, how much of that was actual loss. If that's the order, the Attorney General's office will certainly have time to make that presentation. Let me share a reason. It hadn't come up before. If it goes back, I'm hopeful that this is a new argument at this point, but consider that also. Thank you. All right, thank you, Your Honor. Thank you. I would like to thank both counsels for the quality of their arguments here this morning. We appreciate that. The matter will, of course, be taken under advisement and a written decision will issue in due course. We'll bring you a brief recess to prepare for the next case. Thank you.